[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-10387
Non-Argument Calendar
_____

D.C. Docket No. 1:14-cr-00344-WSD-CMS-8

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ERICA WILLIS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(February 6, 2017)

Before ED CARNES, Chief Judge, MARCUS and FAY, Circuit Judges.

PER CURIAM:

A federal grand jury charged Erica Willis with one count of conspiring to steal government property, 18 U.S.C. § 371; two counts of theft of government funds, 18 U.S.C. § 641; and one count of aggravated identity theft, 18 U.S.C. § 1028A(a)(1).  Willis pleaded guilty to conspiring to steal government property and theft of government funds, and she proceeded to trial on the charge of aggravated identity theft.  After the close of the government's case in chief, Willis orally moved for judgment of acquittal under Federal Rule of Criminal Procedure 29.  The district court reserved ruling on that motion and, after Willis elected not to present any evidence in her defense, the jury returned a guilty verdict.  The district court then denied her motion for judgment of acquittal and sentenced her to thirty-six months imprisonment.  Willis now appeals the district court's denial of her motion for judgment of acquittal.

## I.

Willis' convictions arose from her actions taken as part of a multiperson scheme to cash stolen United States Treasury checks.  Willis became involved in the scheme when she was introduced to Hudhayfah Abdullah.  When Abdullah was interested in purchasing checks, he would call Willis, she would call a man known as "Dred," and the three would meet to complete the sale.  Wiretapped phone conversations between Abdullah, Willis, and Dred recorded them negotiating the number of checks Abdullah wished to purchase and the price he was willing to

2

pay. During those conversations, Willis would sometimes tell Abdullah whether a check had multiple payees, whether a payee was an individual or an entity, and the date a check was issued. On those calls, the three referred to the checks as "TRs" and "statues," which Abdullah testified were both slang for Treasury-issued checks. After the negotiations were complete, Abdullah would go to Willis' home and Dred would give him the checks. Abdullah testified that Willis was present when he examined the checks to make sure they were not counterfeit, including when he held them up to the light to check for an authentic watermark.

Abdullah sometimes asked Willis and Dred to "front" him the checks, meaning that he would take the checks from them, attempt to cash them and, if successful, he would return and pay them a percentage of the amount cashed. And when negotiating the price he was willing to pay, Abdullah would try to get Willis and Dred to lower the price by telling them that he had other expenses, including purchasing a "face" and paying a "runner." Abdullah testified that a "face" meant a fake identification, and that a "runner" was the person who cashed the check. Willis never asked what the words "face" or "runner" meant during their conversations.

## II.

We review de novo the district court's denial of a motion for judgment of acquittal, "viewing the evidence in the light most favorable to the government and

3

drawing all reasonable inferences in favor of the jury's verdict." United States v. Hough, 803 F.3d 1181, 1187 (11th Cir. 2015).  And "[w]e will not overturn a jury's verdict if there is any reasonable construction of the evidence that would have allowed the jury to find the defendant guilty beyond a reasonable doubt."  Id. (quotation marks omitted).

In order to convict a defendant of aggravated identity theft, the government must prove that she, during and in relation to the crime of theft of public money, 18 U.S.C. § 641, knowingly used, possessed, or transferred "a means of identification of another person" without the authority to do so.  18 U.S.C. § 1028A(a)(1), (c)(2).  Among other things, the government must show "that the defendant knew that the means of identification at issue belonged to another person." Flores-Figueroa v. United States, 556 U.S. 646, 657, 129 S. Ct. 1886, 1894 (2009).

Willis contends that the evidence did not show that she knew that fake documents containing real identities would be used to cash the treasury checks she sold.  She argues that the district court erred in denying her motion because the evidence did not show that (1) she knew that the checks were authentic and, as a result, issued to real persons and (2) she knew that the checks would be cashed. She asserts that if she did not know that the checks were authentic, or if she did not know that they would be cashed, then she could not have known that false

4

identification documents containing the identities of real people would be used to cash the checks.

Willis points to evidence showing that counterfeit treasury checks exist, contending that even though the checks she sold looked like treasury checks, the evidence did not show that she knew they were authentic.  A reasonable jury, however, could have concluded that Willis knew that the checks were real treasury checks.  For example, Abdullah testified that Willis was present when he examined the checks, including when he held them up to light to ensure they had authentic watermarks.[1]  And the evidence showed that Willis was familiar with some of the checks because she gave Abdullah specific descriptions of them, including the date issued and number of payees.  Willis also told an investigator that the checks had come from a post office employee, which the jury reasonably could have concluded showed that she knew that the checks had not been counterfeited but instead had been stolen from the mail.  Even though she made that statement to the investigator after she had sold the checks, the jury could have inferred that she knew of the checks' origin at the time she sold them.  Given that evidence, a reasonable jury could have found that Willis knew that the checks were authentic treasury checks issued to real persons.

---

[1] At Willis' trial, Abdullah testified as a witness for the government.

A reasonable jury also could have concluded that Willis knew that the checks she sold would be cashed. Recorded phone conversations revealed that Abdullah, Willis, and Dred discussed "fronting" the checks to Abdullah, meaning that he would pay for the checks only if he could successfully cash them. Willis' conversations with Abdullah also indicate that she knew that he was having someone create false identifications to cash the checks. Abdullah testified that he told Willis that he would have to obtain "faces," a term for false identifications, for the checks she was selling. And he testified that Willis never asked him to clarify what the term "faces" meant. Based on that evidence, a reasonable jury could have found that Willis knew that the checks would be cashed.

Given the common understanding that some form of identification is required to cash checks, and given the evidence showing that Willis knew that (1) the checks were authentic treasury checks issued to real persons and (2) the checks were being cashed, a reasonable jury could have found that Willis knew that false documents containing the identity of real people would be used to cash the checks. As a result, the district court did not err in denying Willis' motion for judgment of acquittal.

**AFFIRMED.**

6